UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-24667-CIV-RUIZ

REBECCA RAPPS, individually
and all others similarly situated,

    Plaintiff,

v.

NORDSTROM, INC.,

    Defendant.

_____

### DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS

Defendant Nordstrom, Inc. ("Nordstrom"), pursuant to 9 U.S.C. §§1 *et seq.,* the Federal Arbitration Act (the "FAA"), moves for the entry of an Order compelling plaintiff to pursue her claims, if at all, in arbitration, and staying this action pending arbitration.

## I. INTRODUCTION

Plaintiff Rebecca Rapps is enrolled in Nordstrom's loyalty rewards program and has repeatedly affirmed her agreement to arbitrate disputes relating to any purchases she has made at Nordstrom stores. Despite her agreement to arbitrate and engage in alternative dispute resolution, plaintiff improperly filed the present lawsuit, which arises from a purchase she made at a Nordstrom store. Accordingly, Nordstrom moves to compel plaintiff to individually arbitrate her claims.

Founded in Seattle in 1901, Nordstrom is a fashion retailer that sells apparel, shoes, and accessories online and in brick-and-mortar stores. Plaintiff alleges that Nordstrom charges "Florida consumers sales and use tax on their purchases" of baby and toddler products which, according to plaintiff, is contrary to a sales tax exemption for such products that the Florida Legislature made

permanent on July 1, 2023. (Compl. ¶¶ 6–9.) The complaint alleges that on "March 2025, Plaintiff purchased toddler shoes and a toddler dress from the Nordstrom" in Miami, Florida. (Compl. ¶ 17.) Based on these allegations, plaintiff filed this putative class action lawsuit on October 9, 2025, asserting claims for fraudulent misrepresentation, unjust enrichment, breach of contract, unconscionability, conversion, violation of the Florida Deceptive and Unfair Trade Practices Act, negligent misrepresentation, and negligence. (Compl. ¶¶ 64–150.)

Plaintiff's claims must be pursued, if at all, in individual arbitration before the American Arbitration Association ("AAA") for two reasons. *First*, plaintiff consented to the Nordstrom Terms & Conditions ("Terms & Conditions"), which contains an arbitration agreement, each time she signed in to her account on Nordstrom's website to make a purchase and through her continued membership and participation in the Nordy Club rewards program. *Second*, plaintiff's claims—relating to purchases she made from Nordstrom—fall squarely within the scope of the binding arbitration agreement in the Terms & Conditions.

## II.   FACTUAL BACKGROUND

**A.   Nordstrom customers agree to the Terms & Conditions each time they sign in to their Nordstrom account and when they sign up for Nordy Club.**

The "Nordy Club" is Nordstrom's loyalty program. When customers create a Nordy Club account or sign in to their Nordy Club account on Nordstrom's website or mobile app, they are required to affirmatively click on an action button after being informed that, by doing so, they are agreeing to Nordstrom's Terms & Conditions and Privacy Policy. Declaration of Julie Blume (Exhibit A) ("Blume Decl.") ¶ 3.

Specifically, such customers are notified that "By selecting **Next**, you agree to our Privacy Policy and Terms & Conditions" with the Privacy Policy and Terms & Conditions set apart in hyperlinked, blue text directly above the "Next" button:

*Id.* ¶ 3 (Exhibit 2).[1]

After signing in to their account, and before making any purchases, customers are again required to agree that: "By placing this order, you agree to our Privacy Policy, Shipping Policy and Terms & Conditions," with the Privacy Policy, Shipping Policy and Terms & Conditions set apart in hyperlinked, blue text immediately above the "Place Order" button:

*Id.* ¶ 4 (Exhibit 3).

---

[1] The current Terms & Conditions on Nordstrom's website have been in place since July 1, 2025, and are available at: https://www.nordstrom.com/browse/customer-service/policy/terms-conditions. Blume Decl. ¶ 2 (Exhibit 1). The arbitration agreement in the Terms & Conditions has remained the same since at least February 16, 2024. *See* https://web.archive.org/web/20240312033130/https://www.nordstrom.com/browse/customer-service/policy/terms-conditions.

In other words, the customer is given the option to review the Terms & Conditions in their entirety, including the arbitration agreement, before deciding whether to accept at both stages. *See id.* If a customer fails to click "Next" and agree to the Terms & Conditions, they cannot sign in to their account. And if a customer fails to click "Place Order," once again agreeing to the Terms & Conditions, the order will not be placed. *Id.* All customers who make purchases on Nordstrom's website, therefore, must affirmatively click at least one button after being informed that, by doing so, they agree to the then-current Terms & Conditions.

B.   **Customers agree to arbitration when they accept the Terms & Conditions.**

Nordstrom's Terms & Conditions were last updated on July 1, 2025. *Id.* ¶ 2 (Exhibit 1). The second paragraph of the Terms & Conditions, set apart in all capital letters, informs customers that it contains an arbitration provision:

> "THESE TERMS INCLUDE A DISPUTE RESOLUTION SECTION THAT INCLUDES AN ARBITRATION AGREEMENT, A CLASS ACTION WAIVER, AND A JURY TRIAL WAIVER THAT AFFECT YOUR RIGHTS. IN ARBITRATION THERE IS LESS DISCOVERY AND APPELLATE REVIEW THAN IN COURT. DETAILS ARE SET FORTH IN SECTION 16, BELOW. PLEASE REVIEW CAREFULLY."

*Id.* at 1.

The Terms & Conditions also contain an informal dispute resolution process requiring that Nordstrom and the customer make a good faith effort to informally resolve any dispute and that the customer first provide Nordstrom with notice of the dispute. *Id.* § 16. Consistent with that intent, "For a period of sixty (60) days from receipt of a completed notice," both parties "agree to negotiate in good faith in an effort to informally resolve the Dispute." *Id.* Customers are additionally given the opportunity to "request a telephone settlement conference to aid in the resolution of the Dispute." *Id.*

4

**C.  The Arbitration Agreement covers disputes relating to online and in-store purchases.**

The Arbitration Agreement in the Terms & Conditions provides:

> Any claim, controversy, or dispute arising out of or relating to these Terms, your access or Use of our Site *or any products or Services offered by or purchased from Nordstrom through* our Site *or store*, *or any aspect of your relationship with Nordstrom*, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, ("Dispute") will be resolved through binding individual arbitration as set forth in this Mandatory Dispute Resolution Section, except (a) either you or Nordstrom may initiate a Dispute in or take a Dispute to small claims court so long as it isn't removed or appealed to a court of general jurisdiction and (b) as otherwise expressly provided herein.

*Id.* (emphasis added).

The Arbitration Agreement thereby broadly applies to "any aspect" of a customer's "relationship with Nordstrom," specifically including any disputes arising out of or relating to "any products or Services offered by or purchased from Nordstrom through our Site *or store*[.]" *Id.* (emphasis added).

**D.  Plaintiff agreed to Nordstrom's Terms & Conditions and Arbitration Agreement each time she signed in to her Nordy Club account to make a purchase.**

Plaintiff has been enrolled as a Nordy Club member since 2016. Declaration of Tom Savage (Exhibit B) ("Savage Decl.") ¶ 5. Plaintiff has made dozens of purchases both in-store and at Nordstrom's website since her enrollment. With each purchase on Nordstrom's website, plaintiff signed into her Nordy Club account and confirmed her agreement to the Terms & Conditions. *Id.*

For example, on December 30, 2024, plaintiff signed in to her account, and then proceeded to make a purchase on Nordstrom's website. *Id.* In so doing, plaintiff agreed to the Terms & Conditions and its Arbitration Agreement *twice*: first when she signed in to her account, and then again when she placed her order. On September 30, 2025, plaintiff again signed in to her account and made another a purchase on Nordstrom's website. *Id.*

Most recently, on October 8, 2025—*the day before she filed this lawsuit*—plaintiff again signed in to her account and made another purchase, once again agreeing (twice) to the Terms & Conditions and its Arbitration Agreement. *Id.*

Despite agreeing to the Terms & Conditions and its Arbitration Agreement multiple times in recent months, plaintiff commenced this lawsuit on October 9, 2025. Dkt. No. 1. Because plaintiff has refused to abide by the Arbitration Agreement and its dispute resolution provisions, Nordstrom now respectfully moves for an order compelling plaintiff to arbitration and to stay this matter.

### III.   LEGAL STANDARDS

**A.   The FAA requires Courts to rigorously enforce agreements to arbitrate.**

Under the FAA, agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011); *see also Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 185 (2019) ("[B]enefits of private dispute resolution [include] lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes") (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)). If a court compels arbitration in a dispute filed in federal court, the FAA requires that the Court stay the litigation pending arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024) (citing 9 U.S.C. § 3).

The FAA is mandatory and does not allow courts to delve into policy considerations regarding arbitration. It "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

"Under both federal statutory provisions and Florida's arbitration code, courts must consider three factors on a motion to compel arbitration: 1) whether a valid agreement to arbitrate exists; 2) whether an arbitrable issue exists; and 3) whether the right to arbitrate was waived." *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1304–05 (S.D. Fla. 2019) (internal citations omitted). Where those elements exist, the FAA "leaves no place

6

for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration" on the issues they have agreed to arbitrate. *Byrd*, 470 U.S. at 218 (citing 9 U.S.C. §§ 3, 4). As a matter of law, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration". *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

## IV.   ARGUMENT

The FAA requires the Court to compel arbitration because (1) plaintiff agreed to a valid arbitration clause in Nordstrom's Terms & Conditions and (2) that arbitration clause covers the claims at issue in the Complaint, which arise out of or relate to plaintiff's "relationship with Nordstrom" as well as products she "purchased from Nordstrom." Blume Decl., Exhibit 1, Terms § 16.

**A.   The Court should compel arbitration of plaintiff's claims because she agreed to the Terms & Conditions, which contain an arbitration provision.**

Plaintiff entered into an agreement to arbitrate when she affirmatively (and repeatedly) agreed to Nordstrom's Terms & Conditions. She was provided conspicuous notice of the Terms & Conditions and manifested her assent to them each time she signed into her account and each time she placed an order on Nordstrom's website.

### 1. Both Washington and Florida law are in accord on contract formation.

In determining whether parties have entered into a binding arbitration agreement, Courts apply ordinary contract formation principles under applicable state law to determine whether parties agreed to arbitrate. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995*)*; *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("whether the choice of law provision applies depends on whether the parties agreed to be bound by [the] Terms of Use in the first place."); *Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021) (same).

Here, plaintiff agreed to the Terms & Conditions each time she logged into her Nordy Club account on Nordstrom's website and made online purchases, and the Terms & Conditions contain a Washington choice-of-law provision. Blume Decl. Exhibit 1, Terms § 17. Florida applies the

7

doctrine of *lex loci contractus* to issues involving matters of contract, which provides that the law of the jurisdiction where the contract was executed governs interpretation of the substantive issues regarding the contract. *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1091 n.1 (11th Cir. 2004).

Florida and Washington law are in accord on the issue of contract formation, however, and "under Florida choice-of-law rules, a court need not resolve a choice-of-law dispute if there is a 'false conflict,' such that the different laws point to the same outcome under the facts of the case." *In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1346 (11th Cir. 2023).

Under Florida law, "courts look to the intent of the parties as manifested in the contract to determine whether an arbitration clause compels arbitration of a particular dispute." *O'Keefe Architects, Inc. v. CED Const. Partners, Ltd.*, 944 So. 2d 181, 185 (Fla. 2006). Likewise, under Washington law, "[i]n interpreting an arbitration clause, the intentions of the parties as expressed in the contract control." *Sales Creators, Inc. v. Little Loan Shoppe, LLC*, 150 Wn. App. 527, 531 (2009).

### 2. "Sign-in wrap" agreements are enforceable so long as a user is given reasonably conspicuous notice of the terms.

"Florida law recognizes various kinds of electronic- or internet-based agreements. When a website requires a user to click a box acknowledging she agrees to certain terms and conditions before proceeding, these are called clickwrap agreements. When a website provides a link to the terms and conditions and does not require the user to click an acknowledgment, they are called browsewrap agreements." *Jimenez v. Crumbl Franchising, LLC,* No. 6:25-CV-601-CEM-RMN, 2025 WL 3251677, at *2 (M.D. Fla. Oct. 15, 2025)

Florida law also recognizes "sign-in wrap'" agreements—alternatively called "modified clickwrap" agreements—whereby a user may provide her consent to be bound by certain terms and conditions by affirmatively signing into a website or application. *Id. See also Marshall v. Hipcamp Inc.*, 735 F. Supp. 3d 1283, 1293 (W.D. Wash. 2024) ("A 'sign-in wrap' agreement is

between a 'clickwrap' and a 'browsewrap' agreement – instead of clicking that they have read the terms of use, individuals affirm that by signing up they agree to be bound by the terms of use.").

Sign-in wrap agreements are generally deemed enforceable when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oatway v. Experian Info. Sols., Inc.*, 2024 WL 4879822, at *5 (W.D. Wash. Nov. 25, 2024) (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). *See also Miami Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689 (Fla. 3d DCA 2025) (Court must determine whether "the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice.") (quoting *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018)).

In determining whether the terms and conditions is reasonably conspicuous, courts examine whether the notice is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023); *see also Rogolino v. Walmart, Inc.,* No. 24-14308-CIV, 2025 WL 396453, at *3 (S.D. Fla. Feb. 4, 2025) ("When assessing the design and content of the relevant interface, courts look to the position of the terms vis á vis the entire webpage, whether the terms are bolded or in upper-case lettering, and whether the user could make a purchase without the terms button in their line of sight.") (internal citations omitted).

In *Oberstein*, the user was required to click on a "Place Order" button, which was directly above language stating: "By continuing past this page and clicking 'Place Order', you agree to our Terms of Use." *Id.* at 516. The "Terms of Use" hyperlink was written in bright blue font, distinguishing it from the surrounding text, and by clicking on the blue "Terms of Use" text, users are transferred to a separate webpage containing the terms, which contained an arbitration provision. *Id.* The Ninth Circuit found this type of notice was sufficiently conspicuous such that a reasonable user would have seen it, and that by clicking on the "Place Order" button, unambiguously manifested consent in the terms. *Id.* at 517.

9

Likewise, in *Engwiller*, the user was found to have assented to the terms where the "Terms of Use" hyperlink was displayed on the center of the page between the two log-in fields—username and password—and the sign-in button" and the phrase "Terms of Use" was "bolded and offset from the rest of the page in a contrasting, brightly colored aqua ink." 410 So. 3d at 689. And, in *Rogolino*, the user was found to have assented to the terms where the "Terms of Use" hyperlink was directly above the "Place Order" button and, even though the hyperlink was not in capital letters or blue font, the location was such that that a reasonable consumer could not checkout without seeing it. *Rogolino*, No. 24-14308-CIV, 2025 WL 396453, at *3 (internal citations omitted).

**3. Plaintiff had conspicuous notice of and assented to the Terms & Conditions each time she signed in or placed an order on Nordstrom's website.**

Here, plaintiff was given conspicuous notice of the Terms & Conditions each time she made a purchase on Nordstrom's website. First, she was notified of and assented to the Terms & Conditions each time she signed in to her account—including on December 30, 2024, September 30, 2025, and October 8, 2025—and was shown the following "Sign In" page:

**Sign In | Create Account**

Enter your email to get started.

**Email**

[     ]

By selecting **Next**, you agree to our Privacy Policy and Terms & Conditions.

[ Next ]

Blume Decl. at Exhibit 2. Similar to *Engwiller* and *Oberstein*, plaintiff was informed that "By selecting **Next**, you agree to our Privacy Policy and Terms & Conditions" with the Terms & Conditions hyperlinked in blue font, and prominently displayed between the "Email" login field and the "Next" button. *Id.*

Second, Plaintiff assented to Terms & Conditions again each time she completed a purchase—including on December 30, 2024, September 30, 2025, and October 8, 2025—when she clicked on the "Place Order" button:

Blume Decl. at Exhibit 3. *See Lee v. Ticketmaster LLC*, 817 Fed. Appx. 393, 394–95 (9th Cir. 2020) (concluding a website user assented to an arbitration provision contained in hyperlinked terms of use when he clicked a "Place Order" button directly above a disclaimer noting that "[b]y clicking 'Place Order,' you agree to our terms of use"); *See also Rogolino,* No. 24-14308-CIV, 2025 WL 396453, at *3.

Like the Sign-In page, the notice of the Terms & Conditions at Nordstrom's Checkout page is hyperlinked and prominently displayed in blue font immediately above the "Place Order" button.

As this Court has found in enforcing a similar sign-in wrap agreement, "[b]ecause it is nearly impossible that any user would not see that statement before hitting 'Continue,' this design is a far cry far from those wherein 'the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them[,]' which have been repeatedly deemed to provide insufficient notice under Florida law." *Bell v. Royal Seas Cruises, Inc.*, No. 19-CIV-60752-RAR, 2020 WL 5639947, at *6 (S.D. Fla. Sept. 21, 2020) (quoting *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 765 (Fla. Dist. Ct. App. 2017)).

Based on these features, Nordstrom's hyperlinked terms are "readily apparent" and are reasonably conspicuous to a website user. *See Oberstein*, 60 F.4th at 416 (determining similarly hyperlinked terms were "readily apparent"). *See also Farsian v. Alphalete Athletics, LLC*, 2025 WL 1591452, at *4 (S.D. Fla. Feb. 25, 2025) ("Florida have typically enforced arbitration agreements contained within hyperlinks that were prominently displayed and located above the action button."). By clicking "Next" and "Place Order" during sign-in and checkout, plaintiff therefore manifested her consent to the Terms & Conditions and its Arbitration Agreement.

B.  **The Court should compel arbitration because plaintiff's claims fall within the Arbitration Agreement.**

Plaintiff's claims—which arise from a purchase she made from at a brick-and-mortar Nordstrom store—fall squarely within the scope of the Arbitration Agreement. It is well established that "[t]he presumption of arbitrability is particularly applicable where the arbitration clause is broad." *Perera v. H & R Block E. Enters., Inc.*, 914 F. Supp. 2d 1284, 1288 (S.D. Fla. 2012) (citing *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 6650, (1986)); *see also James Hardie Bldg. Prods. Inc. v. Good Inc.*, No. C13-05247, 2013 WL 3814667, at *3 (W.D. Wash. July 22, 2013); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

Here, the Arbitration Agreement encompasses all disputes "relating to" "***any aspect of [Plaintiffs'] relationship with Nordstrom***[,]" specifically including "any products or Services offered by or purchased from Nordstrom through our Site ***or store***[.]" Blume Decl. at Exhibit 1, Terms § 16 (emphasis added). *See also James Hardie Bldg. Prods. Inc.*, 2013 WL 3814667, at *3 (explaining that "the language 'relating to' evidences a broad arbitration agreement"); *Venn Therapeutics, LLC v. CAC Pharma Invs., LLC*, 382 So. 3d 6, 13 (Fla. 2d DCA 2024) ("In both Ohio and Florida, courts have categorized arbitration clauses containing 'relating to' as broad clauses.") (collecting cases).

Here, plaintiff's claims are based on a purchase she made at a Nordstorm store in March 2025. (Compl. ¶ 17.) Her claims therefore fall squarely within the Arbitration Agreement—both because the claims relate to Plaintiff's relationship with Nordstrom *and* because they relate to products purchased at a Nordstrom store. Consequently, plaintiff should be compelled to bring her claims, if at all, in individual arbitration.

**C.     The Court should stay this action pending individual arbitration.**

The FAA requires that proceedings be stayed after granting a party's motion to compel arbitration. See 9 U.S.C. § 3. Thus, the Court should stay this action pending the outcome of plaintiff's individual arbitrations, if any. *See Smith*, 601 U.S. at 478 (explaining that when a court "finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding").

## V.     CONCLUSION

For the foregoing reasons, Nordstrom respectfully requests that the Court compel plaintiff to arbitrate her claims on an individual basis and stay the case pending resolution of the arbitration.

Date: November 25, 2025

Respectfully submitted,

HOLLAND & KNIGHT LLP
701 Brickell Ave., Suite 3300
Miami, Florida 33131
Tel: (305) 374-8500
Fax: (305) 789-7799

By: /s/ Scott D. Ponce

Scott  D. Ponce (Florida Bar No. 0169528)
scott.ponce@hklaw.com

By: /s/ Austin Rainwater

Austin Rainwater
Austin.Rainwater@hklaw.com
*Admitted pro hac vice*

*Attorneys for Defendant*

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 25, 2025, I filed this document using the Court's CM/ECF system, which will automatically serve a copy on all counsel of record.

By: /s/ Scott D. Ponce